The next case today is EdgePoint Capital Hldgs, LLC v. Apothecare Pharmacy, LLC. Appeal number 20-1810. Attorney Breyer, please introduce yourself for the record and proceed with your argument. Good morning, Your Honor. It's Michael Breyer for the appellant, EdgePoint Capital Hldgs, and I request three minutes for rebuttal, if that's permissible. Yes, you may. Thank you, Your Honor. EdgePoint seeks today to enforce the terms of an unambiguous contract. The plain meaning of the party's agreement calls for the payment of a success fee due to a transaction with parties that EdgePoint Capital Hldgs identified or contacted during the term of the agreement, where the transaction occurs within 18 months. The district court, although it was undisputed that there was identification of two counterparties to an eventual transaction, Clearview and Starboard, within 18 months after the termination of the agreement, the district court concluded that this language didn't apply in these circumstances. Mr. Breyer, it would help me to just move this along. There are two primary issues presented here. One is an important federal law issue about the broker registration statute. The other is the state law issue about the proper interpretation of the contract and whether summary judgment could have been entered. It is the federal law issue I would ask you to address. Let me start by saying that I think the district court both misread and misapplied the Third Circuit case in Berkeley Group v. Colwitt. Let me also say that I did not find a satisfactory reply in your briefs to the contention that the agreement you signed with Apothecary included all related companies, which included the any transaction at least was likely and possibly certain to involve the transfer of stock held by the holding company. Your factual contention is, oh, it's possible there was an asset sale, whether or not that's the correct test, is a second issue. The first issue is that it may not have been possible that it was an asset sale. Let me tell you my other concern. You seem to say, oh, it's no big deal because this could have been structured to go through the other arm of Edgepoint, which did comply with the brokerage requirements. But the brokerage requirements bring with them an obligation to comply with all sorts of securities laws, so it is a big deal. It's not an insignificant question that it was just a matter of convenience. It also doesn't make sense that it was just a matter of convenience. Your client obviously had different arms and obviously had business reasons for those different arms. So let's start with the fact that the holding company owned the stock and was a related company. Okay? Sure. And before you, if I just could put one more little piece to Judge Lynch's question. The agreement itself, the very last paragraph of the agreement says that it can't be changed without the consent of both parties. So that it wasn't just a simple matter of, okay, I'm going to use one arm because the arm that signed and was obligated in the contract required the other party to the contract to agree to do that. And it's pure speculation that Apothecary would have agreed. Sure. So I heard a lot. I mean, is there any particular point I should just address first? Yes, I directed you to the first point, which is on a reading of the contract, and you can include Judge Thompson's question. The related company was a holding company and therefore any transaction would have involved the sale or transfer of securities. Sure, Your Honor. So clearly this is an LLC. So it doesn't have stock, it has LLC interests. Now the courts have all held that LLC interests can be securities. They can be investment contracts. But in cases of whether, you know, investment contract can... But here the holding company actually held stock as I understand it. There was a transaction where the holding company gained units of the LLC. And so then the question becomes, is this an investment contract? And that depends on whether the intention under the Howey case and under sort of its going to be an investment where other people are earning the profits for you. That's an investment contract. Or is this an investment where you are actually going to have a really significant role in managing? And I discussed that, and I believe it's the 10th Circuit case. I think it's Shodden, where it talks about, you know, are you going to be dependent on the managerial skills of others? And there's no dispute here that Mr. Deji, who was the one who was actually involved in these transactions... I'm sorry, therefore you're reading the related companies out of the contract, aren't you? I'm not reading the related companies out of a contract, Your Honor. You're saying it doesn't matter because this individual actually controlled everything. Right. Well, he wasn't making an investment over which he had no opportunity to exercise control. It wasn't an investment contract in sort of this arm's length situation. Four minutes remaining. I'm sorry. Our premises are getting all mixed up here. One can look at this and say, look, the ultimate transaction did involve investments subject to registration. That isn't how I was looking at it. I was looking at it from the very beginning, from the subscription agreement, and the fact is not just with Apothecary, it is with all related companies, including the holding company. Okay. I believe your response to me was, gosh, even the holding company did not involve any type of investments. Is that correct? It did not involve an investment contract as so defined by the security statute. Alright. Your opponent, of course, disputes that, but then let's move on to the second step, which is the adoption of the Third Circuit case, which was that the illegal activity of a downstream person out of the transaction was only tangential to the party's basic obligations. So even if we thought that the only tangential test applied to the principal parties of a Why could you, what is your argument that this was only tangential? That is very different than saying, oh, it's possible this could have just been an asset sale. Of course, it's not likely to be. Had Edgepoint brokered the sale, and let's assume that it couldn't have been a sale. No, no, no. Go back. The district court did not look at that. It looked at the language of the agreement to start with, and it said, gosh, the way I read the agreement, it is possible it could have been an asset sale, and then relied on a Third Circuit case, which actually was focused on a different part of the transaction and used that language and sort of ignored the language about it's only tangential. So assuming the only tangential test applied even to the principal parties, what is your agreement was only tangential? I don't contend that if there was a securities transaction brokered by Edgepoint under this agreement. Okay, again, you are saying don't look at the agreement, look at what happened. My argument is this, to try to clarify. The primary argument that I make, and that the SJC adopted in NTV, and that my understanding is that the Third Circuit adopted in Berkeley, is that you've got two ways that a contract can be invalidated under Section 29B. Either the contract is made in violation of the securities laws, or it's performed in violations. The way I read NTV, and I disagree with you that the Third Circuit and NTV are the same. In NTV, the court concluded that none of the terms of the contract would have involved a secured transaction. You cannot say that about this situation, nor can you say that in the Third Circuit articulation of the test by the district court. The district court did not say none. It said if it's at all possible that it not be a secured transaction, then the broker registration requirement does not apply. I have to tell you, I think that undercuts the interest that this country has in the proper functioning of the marketplaces. So I'm just laying it out for you. What is your response? My response is, look to the statute itself. The statute refers to voiding contracts that are made in violation of the securities laws, or contracts that are performed in violation of the securities laws. If you really look at the facts and the record, we don't have that here. The contract wasn't made in violation of the securities laws because it does not require a securities violation. Because as everybody agrees, it could have ended up with an asset sale. No, no, no, no, sorry. Your opponent disputes that because of the related party. And then my argument with respect to contractual performance is, look, Edgepoint didn't broker this transaction. It was terminated long before there was a letter of intent or anything of that sort. So there was no contractual performance that violated the securities laws because they were not a broker-dealer. They weren't an unregistered broker-dealer. Okay, go ahead, Judge Lopez. When the discussions began between Edgepoint and Apothecary, the initial documents suggested that the entity that is a registered broker would have been the contracting party on behalf of Edgepoint. And then the deal was consummated. It became a deal with EPCH, which is not the registered broker. Does the record indicate why did that happen? What was the... Why that change between the beginning of the negotiations and the end? Why did that happen? There's no answer for you in the record, of which I'm aware, Judge Lopez. The change happened during these drafts. And the operative contract ended up being in the name of Edgepoint Holdings, not in the name of Edgepoint Advisors. Otherwise, I would be a much happier lawyer. I understand. But, well, you may not know why it happened, but I gather the record does indicate that if, as events developed, it became clear that there had to be a registered broker on Edgepoint's side of the deal that the contract would be assigned to that entity. Is that correct? That is how your client approached these matters? That is. That is. But as Judge Thompson pointed out, you did not have the power to make any such unilateral assignment. You know, I'd have to look into that legal issue about assignment under state law and whether... No, no, no, no, no. Your contract, regardless of that issue, as Judge Thompson has pointed out to you, the contract term required the consent of both parties, parties being broadly defined. For modification, yes, Judge Lopez. Yes. Okay. Thank you. Any further questions? And you do have your three minutes of rebuttal. Thank you. Okay. Thank you, counsel. Attorney Breyer, please mute your audio and video at this time. And, Attorney Dennington, please unmute your audio and video and introduce yourself on the record to proceed. Good morning, Your Honors. I am Andrew Dennington for the FLE Apothecary Pharmacy. And I'd like to focus here on the federal securities law issue, as that seems to be the issue that the court is most focused on. And I want to... Counsel, let me say, absolutely, you should focus on that. But I do want to allow some time for asking some questions about the state law issue of how we should read this contract. But please, proceed with the issue that Judge Lynch has raised. But I do want to allow some time for that other issue as well. Please go ahead. I would first like to answer a question that Justice Lopez posed, which is, why did the contract switch from the registered entity to the unregistered entity? Is there an answer to that on the record? I think there's an answer to the closely related question of why does Edgepoint, as an umbrella entity, have this assignment practice? And if you look at pages 137 through 138 of the record, you see, I think, an answer where Mr. Weinman, who is the managing director of Edgepoint, says that Edgepoint does it to pay less in a FINRA tax. Now, the record didn't fully develop exactly what was the nature of that tax. But I provide the court that information because I think it gets to the question of, is there any good principled reason why this company, in my view, evades the Section 15 broker-dealer registration requirement? Is there any way that this somehow does serve the interests of protecting the marketplace? And there really isn't. And with that, if it's okay, I'd like to turn to the asset sale contingency question. That's really the heart of the matter here. The broker-dealer is an entity, which is... Could I get one more factual question answered, please? Yes. These companies were on a list that the plaintiffs provided. Now, in your brief, you mentioned that there were companies, I mean, that there were a host of companies, including CBS, and that this is just sort of general information. But the specific companies that wound up being the purchasers of the asset, I mean, were they known to your client before the list was produced? No. There's no evidence of that, no. And while it is true that Clearview and Starbird were on the list, and that they went on to later, during the Fetal Provision, the contract speaks to the question of, does that mean that my client owes Edgepoint a success fee? And that's where the Fetal Provision comes in. And the analysis is driven by the language of the Fetal Provision, the agreement read as a whole. In our view, you read the contract from the beginning to the end, the top to the bottom, not the bottom to the top. Okay, well, counsel, let me, I mean, it would seem to be of a concern to the district court, certainly implicit in the agreement, that Edgepoint would realize a windfall if it got this success fee, because it seems clear they did really nothing more than list the names of these two companies that became the ultimate purchaser in this document, a list of three or four hundred companies. Now, it seems to me that this agreement very much contemplates a situation where Edgepoint may indeed be entitled to the excess success fee, even if they did nothing, because it contemplates a situation where Apothecary would enter into a purchase agreement with an entity that only Apothecary had identified or located. And if that happened during the term of the agreement, Edgepoint would still be entitled to a success fee. So the fact that they may not have done anything to earn the fee in the way we may think of earning the fee, that doesn't matter. I mean, that's not, you characterize that as an absurd result. That's not an absurd result. That's exactly the kind of protective measures that Edgepoint took in crafting this agreement. They wanted to be protected against the possibility that they would be out there doing a lot of work and trying to bring parties together, when your client would be out there pursuing its own interests and perhaps making a deal. They were trying to protect themselves against that. And in doing that, there was a potential that they could earn the success fee and not have done anything to bring the parties together. Isn't that true? It is true that as the detail provision is drafted, that Edgepoint could, in that circumstance, if Apothecary was out there, but that's not the facts of this case. To the lot of work argument, for lack of a better term, it is significant that my client did pay Edgepoint the commitment fee, which was, I think, it was $35,000. So it's not the case where Edgepoint is left holding the bag and got no money for, for example, preparing this list. But counsel, isn't it, as a matter of fact, the names of the two entities that became, I guess we can characterize as the purchasers of Apothecary, they were identified, they were identified in a document that was given to your client during the period of this agreement. Is that not so? They were identified on a list, but. Right. Okay. So why, given the language of this agreement, why doesn't that mean that putting aside the very important broker issue that we've been talking about, putting that aside, just in terms of this agreement, why doesn't that mean that they were entitled to the success fee? What, why would the district court feel it had to import some possible dictionary definition into that very common word of identify and locate? Why? Why would the court feel the need to do that? Because respectfully, it simply makes no sense to use that first definition of identify in the sense of this contract. The point of the deal, the point of the agreement is that Edgepoint is going to make a connection between people, companies out there and Apothecary. It's not, what does it mean to establish the identity of a company? It doesn't make sense in the context of this agreement. So- But I mean, it's confusing to me is, are these publicly known companies? I don't know very much about how these investment companies work, but if someone has an expertise in identifying these investment companies, then why wouldn't they have a right to get paid if they, in fact, do what they're contract, they've contracted to do? Well, your honor, Edgepoint was paid $35,000. The question is whether it's- The contract called for that plus more. I respectfully disagree because one question- Counsel, one can easily understand everybody knows CVS is out there, Walgreens is out there. They're potential buyers of an Apothecary company. Judge Thompson's question went to the entity with which the deal was made. Was that well-known in the trade, if you will, as a logical possible acquisition choice or did it take someone with special expertise to put that name on the list? I think it did involve some skill of Edgepoint, but what Edgepoint said would determine that list where they were simply companies that were interested in a healthcare investment generally. I think that it's significant. The term transactional partner has to be respected in the reading of this contract. That's the specific term that the parties used to refer to the type of entity for which Edgepoint would become commission eligible. In no ordinary plain sense was Clearview or Starboard ever a transactional partner during the term of the agreement because it had no idea what Apothecary was. It's simply, it is true that- Counsel, let me ask you, just apropos what you just said, I'm reading from the district court's language and in concluding that identify means something more than just providing the name of a potential buyer on a long list of potential buyers to your client. Did it mean something more than that? The court says EPCH is entitled to a success fee if it identifies a company with some connection, association or close involvement with Apothecary. What does that, what does that mean that these companies on the list had to have some pre-existing relationship or connection with some kind of Apothecary? What does that mean? I think the most tangible way that a company could be identified as a transactional partner would be they would sign a non-disclosure agreement. I think it's significant that the second paragraph of the agreement refers to potential buyers to refer to a pre-NDA company and that potential buyer and transactional partner are used as separate terms. If I may, I'd like to address briefly the securities law argument. I think the question... It may have to be more than brief, counsel. Okay. The asset sale contingency, that can't possibly excuse the broker from having to register because as Justice Lynch said, first off, in the context of this case, it's not very and virtually any case. I would ask the court to look at the regional properties case, which is significant and is correct. That's far more on point than the Berkeley case because that deals with a Section 29 case where the predicate SEA violation is a violation of the Section 15B broker-dealer registration requirement. If you're looking to answer the question, what does it mean to make a contract in violation of Section 15, I would ask the court to look at regional properties. It makes this... Okay. We have actually looked at regional properties. It tends to focus more on the second prong, which is because it was illegal as in fact performed. But at least the initial argument here is about the first prong. By its terms, involved a violation of the act. Involved usually is read expansively. It is usually not read to employ a test of under no possible circumstances could a transaction involving securities be involved. I don't think that's what the Third Circuit meant to say. I don't see how any test that reads the words involved to be a could not possibly, can possibly comply with the statute. Let me go back to your first argument, which is that there was a related entity, a contractual partner, which was a holding company, and what it held were investments. Correct. Well, he says that's not correct. What it held were not investments. I guess this is getting into the question of whether the underlying transaction was a securities transaction, because the holding company was formed later in connection with the transaction. The holding company is a vehicle that holds investment by at least three different entities. Clearview 65%, Starboard 5%, and AJD Investments 30%. The significance of that is setting aside the LLC units don't expressly fit into the definition of security, are they investment contracts? Given the minority stake you see that at least Starboard and AJD have. No, no, no, no, I'm sorry. I may have misunderstood the premise. I want to go back to the related parties referred to in the contract. I thought you said at that point there was a related party which was related to Apothecary and may have been controlled by this individual, but it actually held the interest in Apothecary. Have I misunderstood what was going on? I think you are correct that Mr. Dahj's interest in Apothecary prior to sale, I candidly cannot give you the exact name of the different vehicle, but it was held in some type of a holding company before the sale. That was the basis for my questioning. This goes again to part A of the statute and not part B, involved investment. We agree that there is significance to the use of the word involved rather than required. Justice Lynch, you are correct that the regional properties case is decided on a performance prong, but it has some very important language about what the main prong means. Yes, it does. You are not going to read the word necessarily or require into there. A key challenge, if you were to accept Edgepoint's argument, is when does the registration requirement apply? There are no principled grounds on which you could answer that question under that argument. The broker-dealer activities involve affecting transactions and securities. Before you go there, just a factual question. Edgepoint drafted this contract, didn't it? Yes, it did. And it also drafted the initial draft and then there were negotiations, but it also drafted the agreement that was finally signed? That is correct. All of the language in the agreement was drafted by Edgepoint and it came from a template that Edgepoint uses. Counsel, this may be just a matter of interest, but I think it may go to the fraudulent inducement issue that at least is in the case. Why would it be material to your client whether the Edgepoint party on the other side of this agreement was EPCH or a registered broker, which was one of the entities that was available through Edgepoint? Why would that be so important? Why would that matter? It would matter because if Apothecare used Edgepoint, the unregistered broker, and that unregistered broker put together a transaction and someone bought the company, Mr. Daji would be exposed to the risk that the purchaser might become unhappy and say, wait, this transaction was brokered by an unregistered entity. So I'm going to give him a Section 29 claim and try to void the entire purchase agreement. Time has expired. They say that if the transactions began to develop in that direction, they would then assign the contract to their registered broker entity. What is your response? They do, Your Honor, and as to the assignment point, to me, the assignment point goes in our favor. The fact that this company has a practice of regularly assigning the contracts demonstrates its awareness that it is participating in securities transactions at regular stages of it. So every time Edgepoint uses assignment as a way to explain their behavior, I urge the court to ask when. When does the assignment need to happen in order to comply with the securities laws? The only principled way of understanding that and the one that complies with the statute is you have to register at the outset of the transaction, not two-thirds of the way through or half of the way through, because if you can just assign the contract one day before the closing at the time of the LOI, you've already solicited the investors to the securities transaction. While you were doing that, you were not subject to the very significant records retention requirements and financial reporting requirements of the securities laws. It's not a practice that is permitted by the SCA or should be condoned and it doesn't promote protection of the marketplace. To go back to Judge Thompson's original question, would it be your position that under the terms of this agreement, that that assignment that Edgepoint contemplates could not take place without the consent or agreement of your client? I'm sorry, I was talking over you, Your Honor. That is correct and that's further significant because it shows that yes, this contract does require Edgepoint Capital Holdings, an unregistered entity, to effect a transaction in securities. Unless it becomes an asset sale and I think we've dealt with that, that contingency shouldn't affect the analysis. Again, to summarize, I think Justice Thompson is correct that that second sentence prohibits an assignment unless apothecary were to agree to it and it would also violate the exclusivity provision of the agreement. Edgepoint Capital Holdings agreed to be the exclusive representative. That's why, again, I think that in this case you should hold that an unregistered entity can't sue under the terms of an exclusive brokerage contract to collect transaction-based compensation off the value of a securities transaction. I think my time may be up. All right. If you're caught by surprise by anything your opponent argues at rebuttal, we'll give you one minute. Okay? Thank you, Your Honor. I appreciate it. Thank you. Thank you, sir. You may mute your device at this time. Mr. Dennington and Mr. Breyer, please unmute your audio and video and introduce yourself back on the record. You have three minutes for rebuttal. Thank you, Mr. Clerk. Again, Michael Breyer for Edgepoint Capital Holdings. You know, I think we're sort of now at the grabbin' of the issues regarding the broker-dealer dispute, and I guess the question is, is it enough if a transaction could be, could sometime in the future violate the securities laws, if a contract performance under a contract could, then Mr. Dennington is right. It's possible that this didn't involve an asset sale, that this wouldn't. No, no, no, that was not his argument. His argument was that the fact that it could end up maybe hypothetically involving an asset sale is not enough to get you out of the registration requirements. Right. I mean, in any event, Mr. Dennington's argument, as I understand it, is that it could be an asset, you know, it could be an asset sale, yes. It may or may not involve a sale of securities, but the fact that the contract could be performed in violation of the contract is enough to do it. No, no, no, again, as I understood it, he says the related party was the holding company which held the principal shares and that their position is that those were investment contracts and that therefore, in order to effectuate any sale of the entire entity, it would involve a securities transaction. And he was saying, apart from that, if later it possibly could have been restructured in a way that I guess involved somehow transforming those investment contracts into assets, that doesn't excuse you from the registration requirements. The statutory, I'd urge the court, when it's reviewing the case law, to go back to the statutory test. If you look at 15 U.S.C. 78 CC, you know, it talks about under what circumstances is a contract unenforceable because it violates the securities laws, you know, and the statutory language talks about made or performed in violation. No, I'm sorry, the voidability language is because the contract by its terms involved a violation of the act or B, because it was illegal as in fact performed. You seem to want to read A out of the statute. In any event, I'd urge the court to look back at the statute and I think my understanding of the involved, the contract involved, the prohibited transaction is that that comes from the Berkeley case from the Third Circuit that we've all been discussing. I beg your pardon? That's my understanding of where the involved, involved a prohibited transaction. The Berkeley case is in 2006. The statute predates that by quite a while. It is the subject of the regional properties case decided in 1982. All right. My reading of the NTV case, which is a case from the SJC that I signed. Okay, so are you about to draw a distinction between the federal law requirements and the state law requirements? I'm not. Okay. Because NTV is decided under both. The SJC uses the same analysis and I would urge the court when it's making its decision to take a second look at NTV because I'd suggest to the court that it is in fact really on point here and should be persuasive to the court. NTV, there were explicit, it involved a $330,000 success fee equivalent and there were explicit references in that contract to equity and the party seeking to enforce the contract. The contract provided that NTV was to, quote, source capital and structure financing transactions and, quote, to facilitate investment. None of that language involved securities transactions. My answer to that, Judge Lynch, is that it may very well have, if you're sourcing capital, that could very well involve an investment in the company that involves the sale of securities. I think that that was the major argument that the counterparty in NTV made. They said, look, under this agreement, it's perfectly possible that the agreement was terminated so the party didn't in fact broker the transaction. But the other party in NTV said, hey, this agreement, if it hadn't been terminated, couldn't have led to a security. Okay. We'll take another look at the SJC's view primarily of its own state statute but also of the federal securities law. And I would urge the court also to take another look at Berkeley because Berkeley, again, has this language saying that if an agreement cannot be performed without violating the securities laws, that agreement is subject to rescission under Section 29B. Okay. I think we're going in circles here. I've already replied to that. Do you have a final point? I would say that I understand the court's concerns here. But this is not quite the situation that involved a lot of 29B situations where you have people who have no idea what they're doing, which I think was the case in the regional properties, who are brokering securities transactions. Mr. Weinman, registered broker-dealer, he's affiliated with a company, Edwin Capital Holdings. I'm not saying that that's determinative. Okay. Your opponent says, look, it costs them a lot less not to treat this as involving a securities transaction. Furthermore, he says, my client was at risk of a securities transaction being unraveled under Section 29, and he would not have incurred that risk. So all of that points against your argument that your client got nothing out of this choice that it made. And, you know, you're the ones who drafted the contract. Absolutely. And, look, if the contract violates the securities laws, then it's unenforceable anyway. So the issue of rescission or, you know, this risk that, you know, the client could have been exposed to some kind of risk isn't really, you know, it's sort of putting the car before the horse. But what I'm saying is, to the extent that the court is concerned about public policy in rendering its decision and interpreting the statute, this doesn't involve the sort of willful, flagrant violation of the statute that a lot of the cases are concerned. The statute merely says involved, right? And it's odd to argue this isn't the most egregious case you're ever going to see. Again, I'm not saying it excuses it. I'm saying that to the extent that the court, you know, if they violated the statute, they violated the statute under its language. But what I am saying is that to the extent that the court is looking at, you know, was there wrongdoing, was the public placed at risk, I don't think that Mr. Dennington on that point holds water. This is a case where if you have one single word in the sell-side agreement that we're all talking about, this whole broker-dealer argument would have gone away. Okay. Thank you. With that, I'll address any further questions from the panel. Anyone? No. No. Thank you. That concludes arguments in this case. Attorney Breyer and Attorney Dennington, you should disconnect from the hearing. Dan, just a moment. Yes, Judge. Mr. Dennington, I don't think you were caught by surprise by anything that would warrant us giving you time. Am I wrong about that? He may have just dropped out of the meeting, Judge. I'm sorry about that. Yes, all right. Argument is concluded. We will take a break for three minutes. Thank you very much, Judge, and I'm sorry I interrupted you. I appreciate. We'll go to break now. Court is in recess. Counsel should remain in the meeting.